van Gestel, Allan, J.
The plaintiffs, Edgar Kelen (“Kelen”) and Christopher Pachus (“Pachus”), have filed a class action complaint challenging the constitutionality of a toll discount program (“toll program”) of the defendants, Massachusetts Turnpike Authority (“MTA”) and the Massachusetts Port Authority (“Massport”). They rely on the United States Constitution and the Massachusetts State Constitution. The plaintiffs have alleged, pursuant to 42 U.S.C. §1983, that the defendants violated the constitutional rights of them, and the class they purport to represent, by implementing and enforcing discount toll practices in and around Boston, Massachusetts.
Pending under Mass.R.Civ.P. 12(b)(6) are the defendants’ motions to dismiss: Defendant Massport and Kinton’s Motion to Dismiss, Paper #14; and Motion to Dismiss of Defendants Massachusetts Turnpike Authority and Matthew J. Amorello, Paper #18.

BACKGROUND

Kelen is a resident of the State of New York, and his non-commercial vehicle is registered to his place of residence. Pachus is a resident of Massachusetts, and his two non-commercial vehicles are registered to his place of residence. Both participate in the MTA’s Fast Lane Discount Program (“Fast Lane”). The Fast Lane program enables customers to pay tolls without stopping by use of a small electronic device called a transponder.[1]
Currently, the toll for a non-cómmercial passenger vehicle that uses the Sumner or Ted Williams Tunnel is ordinarily $3.00, but is $2.50 when the vehicle is equipped with the standard Fast Lane transponder, and only $0.40 for residents of East Boston, South Boston, or the North End in Boston.[2] Similarly, the toll for a non-commercial passenger vehicle that uses the Tobin Memorial Bridge is $2.50 when equipped with the standard Fast Lane transponder, but only $0.30 for residents of Charlestown and Chelsea, Massachusetts.[3] The MTA administers the Sumner and Ted Williams Tunnels.
Massport is an independent authority and it administers the Tobin Memorial Bridge.
On September 26, 2005, Kelen paid a toll of $2.50 for transit through the Sumner Tunnel, and on the same day paid a $2.50 toll for passage over the Tobin Memorial Bridge. On February 27, 2003, Pachus paid a toll of $2.50 for transit through the Sumner Tunnel and a toll of $2.50 for transit through the Ted Williams Tunnel. Pachus has also used the Tobin Memorial Bridge, paying tolls of $2.50. Neither Kelen nor Pachus is eligible to receive the toll program discount because neither is a resident of the above identified areas.
Kelen and Pachus allege that the toll program violates (1) the Federal and State Equal Protection Clauses; (2) the Privileges and Immunities Clause of the United States Constitution; and (3) the Commerce Clause of the United States Constitution; all under 42 U.S.C. §1983. Kelen and Pachus seek damages byway of a refund of user fees allegedly overpaid, on a theoiy of unjust enrichment. The MTA and its Chairman (“MTA defendants”) and Massport and its Chief Executive Officer (“Massport defendants”) each have filed motions to dismiss pursuant Mass.R.Civ.P. 12(b)(6).

DISCUSSION

Pursuant to Mass.R.Civ.P. §12(b)(6), this court must accept as true the allegations of the complaint, as well as any reasonable inferences to be drawn in the plaintiffs’ favor. Eyal v. Helen Broad. Corp., 411 Mass. 426, 429 (1991). Kelen and Pachus “need only surmount a minimal hurdle to survive a motion to dismiss for failure to state a claim.” Bell v. Mazza, 394 Mass. 176, 184 (1985). A “complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to *457 relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Equal Protection

Section 1 of the Fourteenth Amendment of the United States Constitution prohibits a state from “denying any person within its jurisdiction the equal protection of the laws.” See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). The equal protection clause prevents states from purposefully discriminating between individuals based on sex, race, color, creed, or national origin. See Shaw v. Reno, 509 U.S. 630, 642 (1993); Cote-Whiteacre v. Dep’t of Pub. Health, 446 Mass. 350, 366 (2006). “(A) classification involving a suspect group or a fundamental right must be supported by a compelling State interest.” Lee v. Comm'r of Revenue, 395 Mass. 527, 529-30 (1985). “Cases not involving a suspect group or fundamental right need be supported only by a rational or conceivable basis.” Lee, 359 Mass. at 530. See also Cote-Whiteacre, 446 Mass. at 366-67.
Kelen and Pachus argue that due to the toll program, their right to travel has been violated. It is beyond dispute that the Fourteenth Amendment guarantees a fundamental right to travel. Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 901-03 (1986). The right to travel “protects travelers against two types of burdens: ‘the erection of actual barriers to interstate movement’ and ‘being treated differently’ from intrastate travelers.” Bray v. Alexandria Women’s Health Clinic, 506 U.S. 263, 277 (1993), quoting Zobel v. Wilson, 457 U.S. 55, 60 n.6 (1982). See also Sanez v. Roe, 526 U.S. 489, 500 (1999). “A state law implicates the right to travel when it actually deters such travel, . . when impeding travel is its primary objective, . . . or when it uses any classification which serves to penalize the exercise of that right.” Soto-Lopez, 476 U.S. at 903.
Kelen and Pachus must meet the test established in Soto-Lopez to demonstrate that their claim is within the relevant zone of interest to be protected. Id. They must allege that the toll program (1) actually deters interstate travel by placing an unlawful burden on their right to enter and leave the state, (2) impedes interstate travel as its primary objective, or (3) uses an impermissible classification, such as race or religion, which penalizes the exercise of their right to interstate travel. See Selevan v. New York Thruway Auth., 470 F.Sup.2d 158, 176 (N.D.N.Y. 2007). Kelen and Pachus have failed to do so. They do not allege, nor could they prove, how the toll program places an unlawful burden on their right to enter and leave the Commonwealth, nor do they demonstrate how the toll program impedes interstate travel as its primary objective. The only “actual barriers to . . . movement” that result from the toll program are located on certain tunnels and a bridge entering and exiting the city of Boston, restricting movement from one area of Massachusetts to another, not restricting movement from state to state. See Bray, 506 U.S. at 277. “Such a purely intrastate restriction does not implicate the right of interstate travel, even if it was applied intentionally against travelers from other States, unless it is applied discriminatorily against them.” Id. Moreover, as this Court can judicially notice, there are several other means to access Boston aside from the two tunnels and the bridge. Therefore, the plaintiffs are unable to allege that the toll program placed an unlawful burden on their right to enter or leave the Commonwealth. Furthermore, the plaintiffs do not allege that the toll program uses an impermissible classification to penalize the exercise of their right to interstate travel. Thus, their equal protection claim does not meet the criteria to be subject to strict scrutiny review.
Kelen and Pachus contend that merely alleging a violation of the right to travel is enough to get over the hurdle of Mass.R.Civ.P. 12(b)(6). However, not every action that affects the right to travel must be supported by a compelling state interest. See Jones v. Helms, 452 U.S. 412, 419 (1981); see also Lee, 395 Mass. at 531. “Only those classifications that serve to penalize the exercise of that right are tested on that strict scrutiny basis.” Lee, 395 Mass. at 530. See Mem’l Hosp. v. Maricona County, 415 U.S. 250, 256 (1974).
A way courts may determine the level of scrutiny to apply is by focusing on the “nature of the benefit denied.” Lee, 395 Mass. at 530. Only those actions resulting in some significant effect on the right to travel will be deemed “penalties.” Id. See Shapiro v. Thomson, 394 U.S. 618, 641-42 (1969) (finding a one-year residency requirement to receive welfare benefits violated equal protection), overruled in part by Edelman v. Jordan, 415 U.S. 651, 671 (1974); Dunn v. Blumstein, 405 U.S. 330, 354-60 (1972) (finding a one-year residency requirement to exercise the right to vote violated equal protection); Mem’l Hosp., 415 U.S. at 269-70 (holding a one-year residency requirement to receive free non-emergency medical case violated equal protection). “Any expense imposed on citizens crossing state lines but not imposed on those staying put could theoretically be deemed a penalty on travel; the toll exacted from persons crossing from Delaware to New Jersey by the Delaware Memorial Bridge is a ‘penalty’ on interstate travel in the most literal sense of all.” Lee, 395 Mass. at 531, quoting Mem’l Hosp., 415 U.S. at 284.
Here, as stated above, the toll program’s burden on interstate travel is minimal and does not violate a fundamental right. This toll program is located wholly within the Commonwealth, only minimally burdens intrastate activity and does not prevent any movement between the states. Therefore, when the Court reviews the plaintiffs’ equal protection claim, it should apply a rational basis standard of review.
The first step in determining whether an action survives rational basis scrutiny is to identify whether there is a legitimate government purpose which the *458 enacting bodies are pursuing. See Nordlinger v. Hahn, 505 U.S. 1, 11 (1992). The second step is to ask whether a rational basis exists for the enacting governmental bodies to believe that the toll program furthers the hypothesis. See id. Therefore, “if there is any reasonably conceivable state of facts that could provide a rational basis for believing that the toll policy is rationally related to these goals, it will pass constitutional muster.” Selevan, 470 F.Sup.2d at 177. See Chebacco Liquor Mart, Inc. v. Alcoholic Beverages Control Comm'n, 429 Mass. 721, 723 (1999). See also Gonzales v. Raich, 545 U.S. 1, 30 n.38 (2005).
The MTA and Massport proffer that the toll program mitigates an adverse impact on the roadways of host communities because they face increased air, noise, and other environmental pollution, traffic congestion, vibration from the use of the bridge and tunnels by large vehicles, extra vehicles exiting onto city streets and because the host community residents use the bridge and tunnels more than others.
In County Bd. of Arlington County, Virginia v. Richards, 434 U.S. 5, 7 (1977), the United States Supreme Court held that a county ordinance that allowed the county manager to determine what residential areas were especially crowded with parked cars from outside neighborhoods and authorized free parking permits to residents of those designated areas, but denied permits to all others, was valid under an equal protection analysis. In that matter, the County Board proffered, and the United State Supreme Court accepted, that the compelling interests of reducing air pollution and other environmental effects of automobile commuting, encouraging car pooling and mass transit use, and restricting the flow of outside traffic to reduce noise, traffic hazards and litter, on its face, rationally promoted the regulation’s objective. Id.
Because the compelling interests in Richards reflect the same interests as here and because the toll program furthers these compelling interests, the toll program does not violate the equal protection clause. Therefore, the defendants’ motions to dismiss the equal protection claim should be ALLOWED.

Privileges and Immunities Clause

Article IV, §2, cl. 1 of the United States Constitution provides that “[t]he Citizens of each State shall be entitled to all privileges and immunities of Citizens in the several States.” The privileges and immunities clause “ ‘establishes a norm of comity,’ . . . that is to prevail among the states with respect to their treatment of each other’s residents.” Hicklin v. Orbeck, 437 U.S. 518, 523-24 (1978); Matter of Jadd, 391 Mass. 227, 228 (1984). “Only with respect to those ‘privileges’ and ‘immunities’ bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally.” Baldwin v. Fish & Game Comm’n of Mont., 436 U.S. 371, 383 (1978) (these rights are referred to as “fundamental” under the clause); Jadd, 391 Mass. at 228. Moreover, “[t]here are some matters so related to State sovereignty that, even though they are important rights of a resident of a State, discrimination against a nonresident is permitted." Jadd, 391 Mass. at 229. See Dunn, 405 U.S. at 343. Thus, “[s]ome interests or rights do not rise to the level of being fundamental, and accordingly, equality of treatment is not required.” Jadd, 391 Mass. at 229. See Baldwin, 436 U.S. at 388. Therefore, “like several other constitutional provisions, the privileges and immunities clause is not absolute in the protections that it affords citizens and a State need not extend to a visitor all of the same rights accorded to a resident.” Cote-Whiteacre, 446 Mass. at 379. See Baldwin, 436 U.S. at 383 (“[A] State [need not] always apply all its laws or all its services equally to anyone, resident or nonresident, who may request it so to do”).
“The plain language of the privileges and immunities clause does not specify those privileges and immunities as to which equality of treatment is required.” Cote-Whiteacre, 446 Mass. at 380. See U.S. Const., art. IV, §2; see also Jadd, 391 Mass. at 228. “Nonetheless, the Supreme Court has enunciated a two-step analysis for assessing challenges brought pursuant to the clause, where nonresidents assert that their rights have been unconstitutionally burdened by a discriminatory statutory classification.” Cote-Whiteacre, 446 Mass. at 380. See United Bldg. & Constr. Trades Council v. Mayor of Camden, 465 U.S. 208, 218, 222 (1984). The Court first must look to whether the action strikes at the heart of an interest deemed so “fundamental” that its derogation would “hinder the formation, the purpose, or the development of a single Union of [the] States.” Baldwin, 436 U.S. at 383, 387. “Some interests or rights do not rise to the level of being fundamental so the analysis ends there, and equality of treatment is not required.” Cote-Whiteacre, 446 Mass. at 380-81. See Baldwin, 436 U.S. at 383, 388.
There is no fundamental right violated by the toll program. The toll program’s burden on interstate travel is minimal and it does not involve a fundamental interest. Kelen and Pachus fail to allege how the discounted toll fees place an unlawful burden on their right to enter and leave the state. Even with all reasonable inferences drawn in their favor, they will still be unable to prove that the toll program bears “upon the vitalfiy of the Nation as a single entity” and that there is a fundamental right being violated treating both resident and nonresidents differently. Baldwin, 436 U.S. at 383, 387.
If the challenged toll program bore on a fundamental right, the program would still fail to pass the second part of test because it does not discriminate “against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States.” Toomer v. Wilsett, 334 U.S. 385, 396-97 (1948). “The classification may be permissible where there is a substantial reason for the difference in treatment other than the mere fact of nonresidency.” Cote-Whiteacre, 446 Mass. at 381. Furthermore,
[T]he inquiry in each case must be concerned with whether [substantial] reasons [for disparate treat *459 ment] do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principal that the States should have considerable leeway in analyzing local [problems] and in prescribing appropriate cures.
Toomer, 334 U.S. at 396.
As stated above, the MTA and Massport suggest that their reasons for the disparate treatment include mitigating an adverse impact on the roadway’s host communities because they face increased air, noise, and other environmental pollution, traffic congestion, vibration from the use of the bridge and tunnels by large vehicles, extra vehicles exiting onto city streets and because the host community residents use the bridge and tunnels more than others. As stated in Richards, granting a slight travel privilege to the communities most affected by the tunnels and the bridge closely relates to the objectives the defendants are attempting to achieve. Therefore, the MTA’s and Massport’s motions to dismiss the privileges and immunities claim should be ALLOWED.

Dormant Commerce Clause

The commerce clause of the United States Constitution grants Congress the authority to “regulate Commerce . . . among the several states.” U.S. Const. art. I, §8, cl. 3. The clause contains both an affirmative grant of power and a “further, negative command, known as the dormant commerce clause . . . that prevents a State from . . . placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.” Am. Trucking Ass’ns, Inc. v. Mich. Pub. Serv. Comm’n, 545 U.S. 429, 433 (2005). See Arronson v. Commonwealth, 401 Mass. 244, 248 (1987). Moreover, the commerce clause is “also intended to benefit those [individuals] who . . . are engaged in interstate commerce.” Dennis v. Higgins, 498 U.S. 439, 449 (1991).
A state law or policy violates the dormant commerce clause if it “clearly discriminates against interstate commerce in favor of intrastate commerce” or “if it imposes a burden on interstate commerce incommensurate with the local benefits secured.” Grand River Enters. Six Nations. Ltd. v. Pryor, 425 F.3d 158, 168 (2d Cir. 2005). The dormant commerce clause is designed to “prevent economic protectionism and retaliation between states and to allow markets to flourish across state borders, thus prohibiting ‘laws that would excite .. .jealousies and re taliatoiy measures between the states.’ ” Ben Oehrleins & Sons & Daughters, Inc. v. Hennepin County, 115 F.3d 1372, 1382 (8th Cir. 1997), quoting C&A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994). See also Opinion of Justices to the House of Representatives, 428 Mass. 1201, 1204 (1998) (noting an “alertness to the evils of ‘economic isolation’ and protectionism,” quoting Philadelphia v. New Jersey, 437 U.S. 617, 623 (1978)).
“The Commerce Clause does not, of course, invalidate all State policies restricting Commerce.” Kassel v. Consol. Freightways Corp. of Del., 450 U.S. 662, 669 (1981). Indeed, “there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.” Id. at 669. In regards to highway tolls, the United States Supreme Court has said that
where a state at its own expense furnishes special facilities for the use of those engaged in commerce, interstate as well as domestic, it may exact compensation therefor. The amount of the charges and the method of collection are primarily for determination by the state itself; and so long as they are reasonable and are fixed according to some uniform, fair, and practical standard they constitute no burden on interstate commerce.
Evansville-Vanderbugh Airport Auth. Dist. v. Delta Airline, Inc., 405 U.S. 707, 712-13 (1972). See Doran v. Mass. Tpk. Auth., 256 F.Sup.2d 48, 55 (D.Mass. 2003) (“[T]oll costs must be discnminatorily implemented or ‘arbitrary or unreasonable’ in their amounts, so burdening interstate commerce, to run afoul of the dormant commerce clause”).
In Arronson, the Supreme Judicial Court stated that
Once a State tax is subject to commerce clause scrutiny, it will be upheld only if it meets the four part test of Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977): the tax (1) must be applied to an activity with a substantial nexus with the taxing State; (2) must be fairly apportioned; (3) may not discriminate against interstate commerce; and (4) must be fairly related to the service provided by the State.
401 Mass. at 248. Before the Brady test is applied, however, the “tax must have sufficient effect on interstate commerce to evoke commerce clause scrutiny.” Id The tax must not “block the flow of natural resources or products of trade from one State to another in order to satisfy local needs.” Andover Sav. Bank v. Comm’r of Revenue, 387 Mass. 229, 247 (1982), citing New England Power Co. v. New Hampshire, 455 U.S. 331, 338 (1982).
In American Trucking Associations, 545 U.S. at 437, the United States Supreme Court found that because an intrastate tax on trucking “[did] not tax interstate truck’s entry into the State nor [did] it tax transactions spanning multiple states,” the tax did not violate the dormant commerce clause. Here, Kelen and Pachus fail to allege that the toll program has any impact at all on interstate commerce. The toll gates are not situated around the borders of Massachusetts, but instead are located in central locations in and around Boston. These tolls do not prevent any person access to the Commonwealth. Any burden on interstate commerce here is negligible, if it exists at all. Selevan, 470 F.Sup.2d at 177. Furthermore, the alleged harm is “not in any way demonstrative of ‘economic protectionism,’ and unlikely to lead to ‘jealousies and retaliatory measures between states.’ ” *460 Id. at 170-71, quoting Ben Oehrleins & Sons & Daughters, Inc., 115 F.3d at 1382. Plaintiffs fail to identify “any in-state commercial interest that is favored, directly or indirectly, by the challenged toll program at the expense of out-of-state competing interests.” Id. at 172. Therefore, the tolls do not have sufficient facial effect on interstate commerce to evoke commerce clause scrutiny.
This Court is aware that the SJC, in an advisory opinion, has said that any inhibition on interstate transportation affects interstate commerce. Opinion of Justices to the House of Representatives, 428 Mass. at 1205. In the Opinion of Justices, the SJC determined that a tax discount for Boston residents on cars rented in Boston violated the dormant commerce clause. Id. at 1211.[4] The SJC reasoned that most people renting cars in Boston plan to travel interstate and that those interstate travelers affect interstate commerce regardless of whether they travel as tourists or for business purposes. Id. at 1206, citing Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258 (1964). In addition, the SJC recognized tourism as a “product of trade” that is “considered by the Massachusetts and Federal governments to be an export for economic purposes.” Id. The SJC opined that, if enacted, a statute allowing the local rental discount would be facially discriminatory, and would not survive the strictest scrutiny. Id. at 1209.
The SJC opinion, however, does not apply in this matter. The statute at issue there had to do with rental purchases of vehicles in commercial transactions. Here, the toll discount does not concern a commercial transaction. Although tourism was considered a product of trade, Kelen and Pachus do not allege that they were participants of a tourist activity. IcL Their complaint only alleges that they were traveling along the roads and paid the tolls. Courts have repeatedly stated that tolls, if reasonable, do not offend the dormant commerce clause. E.g., Evansville-Vanderbugh Airport Auth. Dist., 405 U.S. at 712-13.
Even if the plaintiffs had contended that they were participating in tourist activities, the effects of the toll program would still not violate the dormant commerce clause because there are alternative means to enter and exit the city of Boston. The toll program does not “attempt to give local consumers an advantage over consumers in other States,” rather, it helps alleviate environmental and traffic concerns to participants located in residential, non-commercial, neighborhoods. Camps Newfound/Owatonna, Inc. v. Harrison, 520 U.S. 564, 577-78 (1997). The toll program does not facially effect interstate commerce.
If a state toll does not discriminate against out-of-state economic interests on its face, then the next step is to weigh the toll's burden on interstate commerce against its putative local benefits. Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). The United States Supreme Court has said that “(w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.” Id. The effects of the toll program here are minimal and incidental at best on interstate commerce. Kelen and Pachus have no way to show that the toll program prevents or hinders entry into or out of the Commonwealth. Furthermore, there are alternative means of accessing the Ciiy of Boston without traveling on the toll roads. Moreover, the toll program is not clearly excessive in relation to the local benefits of less environmental impact and traffic congestion. The toll program passes the Pike balancing test.
Finally, in American Trucking Associations, 545 U.S. at 439, Justice Scalia summed up the test for the dormant commerce clause by asking “whether the fee facially discriminates against interstate commerce and whether it is indistinguishable from a type of law previously held unconstitutional by [the United State Supreme Court].” The toll program meets neither of those conditions. The toll program does not facially discriminate against interstate commerce and it is distinguishable from the situation discussed in Opinion of Justices, as the plaintiffs did not plead that they were involved as consumers in a commercial activity. The defendants’ motions to dismiss should be ALLOWED.

ORDER

For the above reasons, Defendant Massport and Kin ton’s[5] Motion to Dismiss, Paper #14, and the Motion to Dismiss of Defendants Massachusetts Turnpike Authority and Matthew J. Amor ello, Paper #18, are each ALLOWED. A final judgment shall enter accordingly.

Kelen and Pachus each have paid the $27.50 fee for the use of the Fast Lane transponder.

East Boston, South Boston and the North End are residential areas located around the tunnels.

Charlestown and Chelsea are residential areas located at the ends of the Tobin Bridge.

In its analysis, the SJC first cited the Supreme Court, which said that “(t]he Court has . . . long since rejected any suggestion that a state or regulation affecting interstate commerce is immune from Commerce Clause scrutiny because it attaches only to a ‘local’ . . . activity.” Opinion of Justices, 428 Mass. at 1205, quoting Commonwealth Edison Co. v. Montana, 453 U.S. 609, 615 (1981); see Camps Newfound/Owatonna Inc. v. Harrison, 520 U.S. 564, 572-74 (1997). Moreover, the Supreme Court has said that “[e]conomic protectionism is not limited to attempts to convey advantages on local merchants; it may include attempts to give local consumers an advantage over consumers in other States.” Id. at 1206, quoting Camps Newfound/Owatonna Inc., 520 U.S. at 577-78. “[A] measure enacted by a city or other locality [that] discriminates against both out-of-State interests and in-State interests outside of that locality does not deflect analysis under the dormant Commerce Clause.” Id.; see Dean Milk Co. v. Madison, 340 U.S. 349, 354 n.4 (1951).

The Court is aware that Mr. Kinton’s, like Mr. Amorello’s, successor in office will be automatically substituted. See Mass.R.Civ.P. Rule 25(d).